AETNA CASUALTY & SURETY COMPANY, Appellant, v. LAUERMAN, Respondent.

*January 9—February 7, 1961.*

For the appellant there was a brief by *Everson, Whitney, O'Melia & Everson* of Green Bay, and oral argument by *James L. Everson.*

For the respondent there was a brief and oral argument by *E. B. Martineau* of Marinette.

DIETERICH, J. The issue on this appeal is whether the judgment entered in 1945, was based upon indebtedness created by the defalcation of the defendant while acting in a fiduciary capacity as administrator of the estate of Dan Roth, deceased. If it was, it was not discharged under the Federal Bankruptcy Act, and accordingly Lauerman is not entitled to have the judgment satisfied under sec. 270.91 (2), Stats., 11 USCA, Bankruptcy, p. 271, sec. 35, sub. (a) (4), which provides:

"(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity; . . ."

Joseph Peter Lauerman, a resident of Muscoda, Wisconsin, in 1929, was employed as a cashier of the State Bank of Muscoda. He was also a member of the board of directors and a stockholder. In April, 1929, Lauerman was appointed by the county court of Grant county administrator of the estate of Dan Roth, deceased, and gave an administrator's bond with Aetna Casualty & Surety Company as surety. The bond was in the amount of $15,000.

The complaint in the action commenced by the Surety Company against Lauerman alleged that on April 8, 1929, Lauerman made a written application to the plaintiff that it act as his surety for him upon an administrator's bond, and incorporated a photostatic copy of the application as part of its complaint. The material portions of the application are as follows:

"4. That the indemnitor will, immediately on the execution of this instrument, deposit in the . . . trust company, or in such other trust company or other legal banking depository, as the indemnitor may select and the surety shall in writing assent to, all moneys belonging to said estate as shall be in the possession or control of the indemnitor, and that hereafter, immediately upon the receipt of any moneys belonging to said estate, will deposit the same in said trust company or other banking depository so selected, and assented to. That the indemnitor will not withdraw any of the sums so deposited, except upon check signed by said indemnitor in his fiduciary capacity and bearing the written consent of the surety to payment thereof. That the indemnitor will immediately give notice to the surety of any deposit made as aforesaid; it being understood and agreed that the consent of the surety to the deposit of any money elsewhere than in said depository, may be revoked at any time upon written notice to the indemnitor, in which event all such moneys shall at once be deposited in such depository as may be agreed upon by the parties hereto in the manner aforesaid. That the indemnitor will keep true and accurate accounts of his trust, which shall, at all times be open for free and uninterrupted inspection and examination by the surety or its authorized representative, and will furnish the surety, at its request, with detailed reports of all receipts and disbursements from time to time, and will duly advertise for claims, in the manner provided by law. The indemnitor further undertakes and agrees to keep the funds of the estate separate from his or her private property, not to mingle them with any other property intrusted to his or her care; that the estate will always be in such condition that it can easily be identified; that he or she will not apply any of said funds to his or her personal use, unless in accordance with law and on written consent of the

surety in each instance, and will, in all transactions, strictly comply with the orders of the court and the requirements of the law governing administration and settlement of said estate.

"5. That the indemnitor will perform all the conditions of said bond on the part of the indemnitor to be performed, and will at all times indemnify and keep indemnified the surety . . . and hold and save it . . . harmless from any and all damages, loss, costs, charges, and expenses of any kind or nature whatsoever, which it may at any time sustain or incur by reason of its suretyship, and will pay over to the surety, its successors or assigns, all sums of moneys which may be paid by or for the surety, or which it may become liable to pay by reason of such suretyship. . . .

"6. That the voucher, receipt, or other evidence of payment by the surety, in discharge of any liability, for which it is or may be liable by reason of such suretyship, shall be *prima facie* evidence, under all circumstances of such payment and of the indemnitor's liability therefor to the surety. That in consideration of the execution of said bond, the indemnitor waives any right to homestead or other exemption, under the laws of any state or territory. . . .

"8. That the surety shall, at its option, have and may exercise in the indemnitor's name or otherwise, any and all rights and privileges which the indemnitor has or may have in the premises."

The complaint further alleges that upon the application it did on or about April 17, 1929, execute as surety, the bond of administrator, a copy of which was incorporated as a part of the complaint. The material portions of the bond are as follows:

"Now, therefore, if the above bounden J. P. Lauerman letters of administration being to him issued, do and shall make and return into the probate registry of said court, within three months, a true and perfect inventory of all the goods, chattels, rights, credits, and estate of said deceased which shall come to his possession or knowledge or to the possession of any other person for him and administer according to law all the goods, chattels, rights, credits, and estate of

said deceased which shall at any time come to his possession, or to the possession of any other person for him and out of the same to pay and discharge all debts and charges chargeable on the same or such dividends thereon as shall be ordered and adjudged by said court; render a just and true account of his administration to said court within one year, and at any other time when required by said court, and perform all orders and judgments of said court by him to be performed in the premises, then this obligation shall be void, otherwise it shall be and remain in full force and virtue."

The complaint alleges that the bond was filed with the county court of Grant county and letters of administration were issued to Joseph Peter Lauerman, as administrator of the estate of Dan Roth, deceased. It further alleges that on or about September 27, 1935, Aetna, by virtue of proceedings in the county court of Grant county, was ordered to and did pay into said county court of Grant county as surety on the aforesaid bond of the defendant herein, and by reason of the defalcation of said defendant as administrator of the estate of Dan Roth, deceased, the sum of $4,478.18, and in addition thereto, incurred and paid the sum of $276.45 on February 6, 1936, as attorneys' fees; that the defalcation of the defendant occurred while the defendant was acting in a fiduciary capacity as administrator of the estate of Dan Roth, deceased, that the defendant has failed and neglected to reimburse the plaintiff for the whole or any part of such sum so paid by it into the county court of Grant county. The complaint further alleges certain credits and then sets forth that the sum now due is $3,764.59.

The answer of the defendant, Joseph Peter Lauerman, denies there was a defalcation by the defendant as administrator, denies information sufficient to form a belief as to proceedings which plaintiff alleges were taken in the county court of Grant county, and alleges that he as administrator of the estate of Dan Roth, deceased, was in possession of a substantial sum of money which he deposited in good faith

and with due care in the Muscoda State Bank in an account in his name as administrator; that after the deposit had been made, the state banking commission closed and liquidated the Muscoda State Bank with the result that defendant, without negligence and for reasons beyond his control, was prevented from producing said money for distribution to the heirs of said estate.

The material portions of the trial court's findings of fact are as follows:

"5. . . . the defendant deposited in the Muscoda State Bank, funds belonging to the estate of Dan Roth, deceased, in the amount of approximately $15,000, said deposit being made in a checking account subject to withdrawal without notice upon the order of the defendant as administrator of the estate of Dan Roth, deceased; that the said Muscoda State Bank was solvent at the time of such deposit, but it thereafter became insolvent and was taken over for liquidation by the state banking commission of Wisconsin; that the defendant continued to act as cashier of said Muscoda State Bank from the time of his appointment as administrator of the estate of Dan Roth, deceased, until after the time that said bank became insolvent and was taken over for liquidation by the state banking commission of Wisconsin; that during said period of time, the defendant was also a director and stockholder of said Muscoda State Bank; that at the time of insolvency of said bank and of the taking over of said bank for liquidation by the state banking commission of Wisconsin, there remained on deposit, unwithdrawn by the defendant, the sum of approximately $6,000 in the account of the estate of Dan Roth, deceased.

"6. That thereafter when required so to do by the county court of Grant county, Wisconsin, the defendant failed to fully account as administrator of the estate of Dan Roth, deceased, for the sums found due from him as such administrator, and on or about the 27th day of September, 1935, the plaintiff, Aetna Casualty & Surety Company, by virtue of proceedings in said county court and pursuant to the order of said county court was ordered to and did pay in to said county court of Grant county, as surety on the aforesaid bond of the defendant herein, by reason of the said

failure of the said defendant as administrator of the estate of Dan Roth, deceased, to account therefor, the sum of $4,478.18, said payment being made and evidenced by draft of the defendant in said amount payable to the county court of Grant county, received in evidence in this proceeding as plaintiff's exhibit . . ."

The conclusions of law of the trial court are as follows:

"1. That defendant is indebted to the plaintiff, inclusive of interest on unpaid balances in the amount of $6,128.30; that said indebtedness was created by the defalcation of the defendant while acting in a fiduciary capacity as administrator of the estate of Dan Roth, deceased."

Judgment was entered on the findings on April 16, 1945, in the amount of $6,237.10.

In order to determine whether the liability of a judgment debtor is excepted by the provision in sec. 17, sub. a. (4) of the Bankruptcy Act from release which is otherwise effected by a discharge in bankruptcy, the court will look behind the judgment and consider the entire record to determine the source and character of the debt. *Globe Indemnity Co. v. Granskov* (1944), 246 Wis. 87, 16 N. W. (2d) 437; *Klatt v. Helming* (1946), 248 Wis. 139, 21 N. W. (2d) 261; *Whelan v. United States Guarantee Co.* (D. C. Cir. 1958), 252 Fed. (2d) 851, 102 U. S. App. D. C. 287; and *Wegiel v. Hogan* (1953), 28 N. J. Super. 144, 100 Atl. (2d) 349.

Joseph Peter Lauerman was adjudged a bankrupt at Manitowoc in the district court of the United States, Eastern district of Wisconsin, on June 9, 1949. The Aetna Casualty & Surety Company was alleged as a judgment debtor in the schedules. The petition was filed on November 12, 1948, and subsequently he was discharged from all debts and claims, excepting such debts as were excepted from the operation of a discharge in bankruptcy. In the instant case the exception was that if the judgment debt was a defalcation it was not discharged by the adjudication in bankruptcy.

Aetna Casualty & Surety Company contends that since no appeal was taken from the circuit court judgment obtained against Lauerman, the findings of fact, conclusions of law, and judgment therein become *res adjudicata,* while Lauerman takes the position that the trial court can look behind the judgment to examine the facts in the case and the actual fact disclosed in such examination will govern the determination of whether or not the liability under the judgment is excepted by the provisions in sec. 17, sub. a. (4) of the Bankruptcy Act.

In the instant case the Aetna Casualty & Surety Company had the burden of proof as to Lauerman's defalcation. The record does not include any of the proceedings of the county court in probate of Grant county relative to any accounting made by Lauerman. It does disclose the filing of the bond, letters of administration in the county court, and that the Aetna Casualty & Surety Company pursuant to an order of the county court issued its check in the amount of $4,478.18 payable to the county court of Grant county.

Lauerman was cashier, director, and stockholder of the Muscoda State Bank until it was closed and taken over by the state banking commission. The record discloses that the bank was solvent when he deposited approximately $15,000, this amount being the proceeds of a mortgage which was an asset of the Roth estate. The day the bank was closed by order of the state banking commission there was on deposit in the name of Joseph Peter Lauerman, as administrator of the estate of Dan Roth, deceased, a balance of approximately $6,000. The evidence does not establish that the failure to withdraw the balance remaining in the checking account at some time prior to the closing of the bank was more than negligence. To constitute a defalcation within the meaning of the Bankruptcy Act there must be proof of bad faith or misconduct as distinguished from mere negligence or mistake. *Indemnity Ins. Co. v. Leibrock* (1945), 55 N. Y. Supp. (2d) 3; *Central Hanover Bank & Trust Co. v. Herbst* (2d Cir.

1937), 93 Fed. (2d) 510, 114 A. L. R. 769; *Whelan v. United States Guarantee Co., supra.*

In 20 Am. Jur., Evidence, p. 127, sec. 120, it is stated:

*"Business, Financial, and Economic Conditions.*—It is well settled that the courts take judicial notice of generally known financial and business conditions at given times. Judicial notice will be taken of the existence of a general economic or financial depression, its widespread extent, and the general effect it has on business conditions. Thus, the courts will judicially notice the fact that the period between 1871 and 1873 was one of severe financial depression and falling prices, the great financial depression during October, 1907, the depressed business conditions in 1921, the general business collapse following the stock-market crash in 1929, and the business depression of 1935. The courts will take judicial notice of the existence of a world-wide financial crisis. Judicial notice will also be taken of the fact that an extraordinary number of people are in dire need as a result of a depression, leading to unparalleled demands for relief and necessitating the closing of many banks."

In *Suring State Bank v. Giese* (1933), 210 Wis. 489, 491, 246 N. W. 556, this court said:

"The court takes judicial notice of the fact that the present economic depression has not merely resulted in a serious dislocation of the value of real estate, but also in the almost complete absence of a market for real estate."

See *Estate of Pratt* (1936), 221 Wis. 114, 266 N. W. 230.

The records of the state banking commission disclose that in 1932, 65 state banks closed, four reopened the same year, and in 1933 one reopened. In 1933, 53 state banks closed, two reopened in 1934, and in 1934 one consolidated with a bank still doing business, in 1935 one reopened. In 1934, 20 state banks closed and in 1935, five state banks closed.

During the days of the great depression in the early thirties whether a bank, such as the Muscoda State Bank, was solvent from one day to the next depended almost entirely upon how

much could be realized upon forced liquidation from the notes and mortgages in which its assets were largely invested. Such notes and mortgages in those depression days had no ready market. Whether such a bank was insolvent as of any particular day was impossible of immediate determination and could not be ascertained until long afterward. Under such conditions, and the meager record before us on this appeal, we cannot hold that Lauerman, even though an officer and director of the bank, knew or should have known the bank was insolvent on any day prior to its closing by the banking commission. We deem it would be a grave miscarriage of justice under these circumstances to determine that his failure to withdraw the deposit of estate funds prior to the bank's closing constituted a defalcation within the meaning of the Bankruptcy Act.

Defendant's liability is predicated entirely on the contractual terms of the application and bond. The provisions contained in the application and bond are that the defendant agreed to indemnify the surety and save it harmless from all damages which it may sustain by reason of the suretyship, and will pay over to the surety all sums of money which may be paid by the surety by reason of such suretyship.

The record reveals that the trial was conducted throughout as one involving an action on contract, and the conclusion of law "that said indebtedness was created by the defalcation of the defendant while acting in a fiduciary capacity as administrator of the estate of Dan Roth, deceased," was not essential to support the judgment.

In the case of *Klatt v. Helming, supra,* this court held (p. 142) :

"The inclusion of a mere finding which is unnecessary to sustain the judgment is not sufficient."

The order is affirmed.

*By the Court.*—Order affirmed.