**In re Kevin KOCH, Debtor.**

**CHASE LUMBER & FUEL CO.**

v.

**Kevin KOCH.**

**Bankruptcy No. 95–30691–7.**
**Adversary No. 95–3104–7.**

United States Bankruptcy Court,
W.D. Wisconsin.

May 23, 1996.

Mr. John A. Heibl, Madison, WI, for Plaintiff.

Mr. Jerry J. Armstrong, Madison, WI, for Defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Kevin Koch, while a sole proprietor, contracted for roofing jobs and purchased materials from various suppliers. Between

August, 1990, and November, 1990, Koch maintained an account with Chase Lumber & Fuel Company, Inc. He used materials purchased from Chase Lumber to complete numerous roofing repairs. According to Koch, he paid "whatever I had at the time from time to time." Chase Lumber credited the payments against the oldest charges. Koch folded his business in December, 1990. When he stopped paying on his Chase Lumber account, there remained thirty unpaid invoices totaling $4,766.25 in principle and interest. On November 25, 1991, Chase Lumber filed suit against Koch to collect the account, and sometime between December, 1991, and June, 1994, judgment against Koch was entered in the amount of $5,886.08.

Beginning in July, 1994, Chase Lumber garnished Koch's wages at a rate of approximately $79.60 per week. In total, Chase Lumber recovered $2,697.76, including $71.41 garnished from a paycheck issued to Koch four days after he filed for bankruptcy on March 6, 1995. Chase Lumber filed this adversary complaint on June 8, 1995, seeking to have Koch's remaining debt of $5140.25 declared nondischargeable on grounds of defalcation under 11 U.S.C. § 523(a)(4). A trial was held on November 29, 1995. The elements required to establish a § 523(a)(4) exception to discharge of a claim are (1) the existence of a trust; (2) the debtor having been a fiduciary of that trust; and (3) fraud or defalcation by the debtor while acting as a fiduciary of the trust. *See, e.g., In re Eisenberg*, 189 B.R. 725, 730 (Bkrtcy.E.D.Wis. 1995).

Wisconsin's "theft-by-contractor" statute, Wis.Stat. § 779.02(5), is part of Wisconsin's construction lien law, Wis.Stat. § 779.01 *et. seq.* (1993–94), and purports to create a fiduciary relationship, to wit:

> [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claim shall been paid[.] The use of

any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the ... contractor of moneys so appropriated and is punishable under s. 943.20.

The statute makes a contractor a trustee of funds received from an owner until the laborers, material suppliers, or subcontractors are paid for work or materials put into the specific improvement for which the payment was made. *In re Thomas*, 729 F.2d 502, 506 (7th Cir.1984); *State v. Stepniewski*, 105 Wis.2d 261, 314 N.W.2d 98 (1982) (considering an analogous statute); *State v. Wolter*, 85 Wis.2d 353, 270 N.W.2d 230 (1978) (same). The Wisconsin Supreme Court in *Kraemer Bros. Inc. v. Pulaski State Bank*, 138 Wis.2d 395, 402–03, 406 N.W.2d 379 (1987), discussed the general principles underlying Wisconsin's theft-by-contractor law:

> The limited case law on this subject suggests that as long as payments can be traced from the owner to the subcontractor the monies in the hands of the subcontractor are held in trust under the statute for the benefit of the second-tier subcontractors. This interpretation of the statute comports with the practices of the industry. Typically the prime contractor serves as a conduit for payments from an owner to a subcontractor. This interpretation also comports with the policy of the statute, which is to assist subcontractors and their subcontractors and suppliers in getting paid and to protect owners and prime contractors from paying twice.

As the word "conduit" implies, the trust cannot be imposed where no demonstrable chain connects materials to the specific job for which the owner paid the contractor. In this case, Chase Lumber presented evidence that there were thirty unpaid invoices totaling, before interest, $3,941.90. Only five of those invoices contained a reference to a specific job. (Plaintiff's Exh. 1, invoices #'s 1, 11, 16, 23, 25). The other invoices appear to have been for tools with anticipated life beyond a single job and supplies which could have

been used on many jobs. The evidence failed to tie any of the other invoices to a job in a manner sufficient to impose a trust under the statute. The five invoices totaled $1,388.30. All of the invoices were for materials incorporated into "improvements" as defined by the statute. Wis.Stat. § 779.01(2)(a). For four of the five jobs (invoices # 1, 11, 16, and 25), Koch was paid in full. As to invoice # 23, in the amount of $116.50, Koch testified that he was paid all but $500 for a job on which he billed between $1,200 and $1,500. Koch worked alone on most jobs, including the five to which invoices were identified. Therefore, Koch was a fiduciary of Chase Lumber for those five invoices and held funds totaling $1,388.30 in trust for Chase Lumber.

■ The state and federal decisions involving breaches of duty under Wis.Stat. § 779.02(5) and its analog, Wis.Stat. § 779.16, have generally failed to address the precise issue of the fiduciary's standard of care, appearing to rely on something akin to strict liability. *See, e.g., Capen Wholesale, Inc. v. Probst,* 180 Wis.2d 354, 363, 509 N.W.2d 120 (Wis.Ct.App.1993); *In re Berg,* 172 B.R. 894, 896 (Bkrtcy.E.D.Wis.1994); *In re Thomas,* 729 F.2d 502, 505–06 (7th Cir. 1984); *In re Lotto,* 21 B.R. 767, 770–71 (Bkrtcy.E.D.Wis.1982). In other contexts, however, Wisconsin state courts have applied an affirmative misconduct standard to defalcation. *See, e.g., Aetna Casualty and Surety Co. v. Lauerman,* 12 Wis.2d 387, 107 N.W.2d 605 (1961). In *Aetna Casualty,* which involved a breach of a written surety agreement, the court observed, "To constitute a defalcation within the meaning of the Bankruptcy Act there must be proof of bad faith or misconduct as distinguished from mere negligence or mistake." *Id.* at 395, 107 N.W.2d 605.

The issue is important because it may no longer be enough to assume, as courts have apparently done, that a violation of the "theft-by-contractor" statute is *per se* defalcation as envisioned by the Bankruptcy Code. After surveying state law and concluding that the vast majority of courts historically require negligence, the Seventh Circuit recently concluded that "defalcation" in bankruptcy requires more than negligence,

though less than fraud. *Meyer v. Rigdon,* 36 F.3d 1375, 1382–85 (7th Cir.1994) (applying the standard to both § 523(a)(4) and § 523(a)(11)); *see also Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 255–57 (6th Cir.1982) (defalcation requires no intent but cannot rest on mere negligence); *In re Moreno,* 892 F.2d 417, 421 (5th Cir.1990) (defalcation is "a willful neglect of duty, even if not accompanied by a fraud"). *Meyer* is not precise, suggesting only that something akin to "reckless" may be the appropriate standard.

The *Meyer* survey did not include a Wisconsin decision, and it is unclear whether that is because the court read *Aetna Casualty* and like cases and concluded that the Wisconsin standard was higher than negligence, or because the court could not determine a consistent standard in the Wisconsin decisions. Either way, *Meyer* does not provide any direct guidance as to the application of the defalcation standard under 11 U.S.C. § 523(a)(4) to Wisconsin' theft-by-contractor statute.

None of the reported decisions in this circuit in recent decades involved an operator as small as Koch nor a contractor/supplier relationship as informal as the Koch/Chase Lumber arrangement. A survey of other jurisdictions revealed only one reported decision with facts closely analogous to this case. In that decision, the court held the contractor's debt to the supplier to be dischargeable. *See In re Crea,* 31 B.R. 239 (Bkrtcy.D.Minn. 1983). Crea was a longtime sole proprietor of a pipe-insulating business who purchased materials from one supplier on an open account basis, was billed monthly, and finance charges were levied against the unpaid invoices. The supplier was able to identify the destination of materials which Crea ordered delivered to the site because the invoices reflected the delivery destination, but could not tie other invoices to specific jobs. Nor were payments by Crea to the supplier earmarked for specific invoices; rather, as in our case, payments were applied to the oldest invoices. The credit relationship between the parties was uneven, and eventually the supplier obtained a default judgment against Crea for over $30,000. After Crea filed for

bankruptcy, the supplier sought to have his debt declared non-dischargeable under § 523(a)(4), based on a violation of a Minnesota statute with significant similarities to, but also significant differences from, the Wisconsin theft-by-contractor statute.[1] The *Crea* court declared the debt dischargeable because the Minnesota statute did not create an express fiduciary relationship and because the intended beneficiaries of the statute, according to the court, were property owners rather than suppliers. *Id.* at 244–45. In discussing the nature of the relationship between Crea and his supplier, the Minnesota court observed that, as a general rule, a supplier who runs an open account on a contractor, who applies payments to the oldest invoices rather than insists on tying payments to specific jobs, and who generally keeps poor records regarding the intended destination of supplies purchased on account should not be able to impose a non-dischargeable trust obligation on the contractor/debtor.

Unlike the statute at issue in *Crea*, the Wisconsin theft-by-contractor statute creates an express fiduciary relationship and delineates clear duties, and Wisconsin contractors are charged with knowledge of the law in this area. The Wisconsin statute has also been interpreted to benefit all parties to property improvement contracts equally, so long as the requisite fiduciary relationship is established. *Kraemer Bros.*, 138 Wis.2d at 403, 406 N.W.2d 379. Therefore, *Crea* can be distinguished from this case on the basis of statutory language and purpose.

Whether or not *Crea* is persuasive, the Seventh Circuit's raising of the standard for defalcation, to something more than negli-gence, brings into question the entire body of pre-*Meyer v. Rigdon* case law on the theft-by-contractor statute. Before *Meyer*, the question was whether Koch's actions violated the statute. Koch's actions certainly square with those that the theft-by-contractor statute is designed to prevent. After *Meyer*, however, the question appears to be whether Koch's actions entailed bad faith or affirmative misconduct rather than mere negligence or mistake. Though Koch's testimony was not entirely clear on this point, it appears that he had spent some years working in the construction field in Wisconsin prior to forming Koch Building & Repair and opening his account with Chase Lumber. As a sole proprietor, Koch was regularly taking on and finishing jobs worth thousands of dollars, and for the jobs at issue here, he agreed that the materials listed on the invoices were incorporated into the identified improvements and that he was paid relatively promptly, and generally in full, for those improvements.

■ Nothing in the pre-*Meyer* case law in this circuit suggests that a sole proprietor such as Koch should be exempt from the statute so long as reliable evidence can tie materials to the improvements for which Koch was paid. Nevertheless, after *Meyer*, Koch's actual or constructive knowledge of the theft-by-contractor statute, or at least of his trust fund duties as a general contractor, would seem to be material. It is the plaintiff's burden to show by a preponderance of the evidence that more than mere negligence led to the debtor's failure to pay. *Grogan v. Garner*, 498 U.S. 279, 289–91, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). That burden has not been met. Since no evidence was

---

1. The statute at issue in *Crea*, Minn.Stat. § 514.02 subd. 1, states:

> Whoever, on any improvement to real estate ... fails to use the proceeds of any payment made to him on account of such improvement by the owner of such real estate or person having any improvement made, for the payment for labor, skill, material, and machinery contributed to such improvement, knowing that the cost of any such labor performed, or skill, material, or machinery furnished for such improvement remains unpaid, and who has not furnished to the person making such payment either a valid lien waiver as to any un-paid labor performed, or skill, material, or machinery furnished for such improvement; or a payment bond in the basic amount of the contract price for such improvement, conditioned for the prompt payment to any person or persons entitled thereto ..., shall be guilty of theft of the proceeds of such payment and upon conviction shall be fined not more than $1,000 or imprisoned nor more than one year, or both.

The Minnesota statute differs from the Wisconsin statute in two significant ways: It does not create an express fiduciary relationship, though it implies one, and it has a scienter element (the defendant must know that costs remain unpaid).

presented by either side regarding Koch's actual knowledge of the statute, his experience alone is asked to support the inference that he had, or should have had, knowledge of the trust fund requirements and that his failure to pay over funds received from owners to Chase Lumber constitutes a more-than-negligent breach of fiduciary duty. Based on the demeanor of the debtor as a witness and the whole of the evidence presented in this case, I am unwilling to draw such an inference. Without it, for the reasons stated above, the complaint in this adversary proceeding must be dismissed.

██ Koch contends that Chase Lumber violated the stay by accepting $71.41 in garnished wages from Koch's employer. Both the paycheck in question and the check issued by Dane County Roofing to Chase Lumber are dated March 10, 1995, four days after Koch filed for bankruptcy. Chase Lumber argues that the stay was not violated because the paycheck and garnished wages were due and owing to Koch and Chase Lumber, respectively, on March 3, 1995, when the pay period ended. The specific question is whether wages earned prepetition that are subject to a garnishment lien can be captured postpetition by the garnishing creditor without violating the automatic stay.

11 U.S.C. § 362(a) states in relevant part:

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title[.]

Property of the estate includes, with some limitations not relevant here, "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

██ If Chase Lumber's interest in the garnished funds did not attach prior to the filing of the case on March 6, 1995, then there is no question that its postpetition retention of the garnished funds is a violation of the stay. Even if Chase Lumber's interest attached prepetition, however, its retention of the funds violated the stay so long as Koch retained, if not a legal interest, at least an equitable interest in those funds at the time of filing.

██ "In the absence of controlling federal law, 'property' and 'interests in property' are creatures of state law." *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992). Under Wisconsin's earnings garnishment statute, Wis.Stat. § 812.30 et. seq. (1993–94), the initial order of garnishment, subject to the debtor's right to answer the complaint, remains in effect for 13 weeks. Wis.Stat. § 812.35(5); 812.44. Debtor and creditor can stipulate to extensions of the original order for up to an additional 13 weeks per extension. Wis.Stat. § 812.40. Under a wage garnishment, the creditor's lien does not arise and cannot attach until the debtor earns the wages. *See In re Krumpe*, 60 B.R. 575, 577 (Bkrtcy. D.Md.1986); *In re Passmore*, 156 B.R. 595, 598 (Bkrtcy.E.D.Wis.1993). Once earned by the debtor, the statute effectively segregates the wages into funds owed to the debtor and funds owed to the garnishing creditor. The employer is liable for failure to turn over the garnished funds to the creditor. Wis.Stat. § 812.41. When that liability arises, the debtor has no legal interest in the funds earmarked for garnishment.

██ Nevertheless, the debtor retains an equitable interest in the earmarked funds through the right to contest the garnishment. *See e.g. In re Woodman*, 8 B.R. 686, 688 (Bkrtcy.W.D.Wis.1981). The debtor may claim an exemption under Wis.Stat. § 812.34(2)(b) or assert any defense to the garnishment in an answer delivered to the garnishee *at any time during the garnishment period*. Wis.Stat. § 812.37(1). Once it

receives the answer, the garnishee must mail a copy to the garnishor within 3 business days, Wis.Stat. § 812.37(2), and must presume that the claimed exemption or defense is true and binding and cease payment to the creditor until the issue is resolved after a judicial proceeding. Wis.Stat. §§ 812.37(3) and 812.38. The debtor's equitable interest is not extinguished until the right to contest the garnishment is extinguished, which can occur no earlier than the time the garnishee is liable under the statute to turn over funds to the garnishor. In this case, that day was five business days after the end of the pay period, or March 10, 1995. Wis.Stat. § 812.39(1). Since Koch retained an equitable interest in the garnished wages on March 6, 1995, the day he filed for bankruptcy, his interest became "property of the estate" under 11 U.S.C. § 541(a)(1) on that day.

 Relying primarily on § 362(a)(1) and (2), courts have consistently placed an affirmative duty on garnishing creditors to stop garnishment proceedings once notified of the bankruptcy filing and to return any funds garnished in violation of the stay to the estate. See e.g. In re Roberts, 175 B.R. 339, 343 (9th Cir. BAP 1994); In re Dungey, 99 B.R. 814, 816–18 (Bkrtcy.S.D.Ohio 1989). At a minimum, Chase Lumber had a duty to stop the completion of what were arguably mere ministerial tasks by Dane County Lumber because those tasks involved the "enforcement ... against property of the estate, of a judgment obtained before the commencement of the case[.]" 11 U.S.C. § 362(a)(2). Chase Lumber's retention of the funds was not inadvertent as that term is used in these circumstances, because inadvertence requires no knowledge of the existence of the stay. See Roberts, 175 B.R. at 344. Nevertheless, the violation appears to have been technical rather than willful, and the appropriate sanction requires no more than the return of the $71.41 caught by the garnishment. 11 U.S.C. § 362(h). Resolution of this issue does not appear to have added to Koch's legal fees since the facts were never in dispute and Koch did not brief the issue either before or after trial.